And thank you, Mr. McBurney, for your service to the nation. Thank you very much. Okay, the next case is number 2010-1258, MCORE CORP v. OPTIUM CORP. Mr. Klein, if you're ready. Thank you, Your Honor. May it please the Court. This is a case before the bench following a jury trial. There were two plaintiffs. There were two classes of products accused. There were three patents. There were a lot of issues that were in the brief, and in the limited time available, I'm certainly pleased to address the issues and the orders that the Court would find most productive. I'd encourage you to select the issue that you think is most likely to achieve whatever result you need. Okay, what I would say, Your Honor, is I think some of the issues range from rather straightforward to more nuanced. I think some of the more straightforward issues include the damages issues, for example. The jury in this case awarded lost profits damages to one of the plaintiffs in the case, JDS Uniphase, finding that it lost profits on sales of infringing modulators. A review of the record, however, reveals that there was absolutely no evidence presented whatsoever concerning JDS Uniphase's capacity to produce any additional modulators. There was no JDS Uniphase witness who testified. There were no JDS Uniphase documents that were presented. The evidence that the plaintiffs point to in the briefing concerning capacity all concerns MCOR's capacity. So it seems to us a straightforward issue. There was no evidence of JDS Uniphase's capacity to produce modulators. They were not entitled to recover lost profits damages. In the absence of modulators, MCOR could not have produced transmitters on which it was awarded lost profits damages. Every transmitter, every XMOD transmitter requires a modulator. There was no evidence that MCOR could obtain modulators from JDS Uniphase because there was no evidence that JDS Uniphase could produce those modulators. You raised these arguments to the jury, I assume. Yes, we did, Your Honor. And we moved for JML on the issue. The court denied it. We think there is not only any scintilla, there's no substantial evidence whatsoever upon which this jury should have concluded what it concluded. Can I ask you a couple questions about the other lost profits issue? This is in particular the one about whether or not there exists non-infringing alternatives. That's the QAM transmitter, Your Honor. Right. As I understand it, is the only testimony in the record about how long it took from anyone with technical expertise, is that your testimony of Mr. Fiorillo? That's correct, Your Honor. I don't have the problem to say that. No, you're saying it absolutely correct. Mr. Fiorillo. Okay. And he testified, you know, very, very simple tasks. I mean, all this really is is substituting couplers for resistive divider networks. That's exactly right. And he said it took him seconds when asked the question to come up with it. That's right. And no more than six weeks to get it in full production and out there. It's just that they didn't decide to move forward with it. Is that as I understand it? That's absolutely correct. And do I understand that they didn't offer any contradictory expert or any technical witness who testified to the contrary? That's correct, Your Honor. In fact, I would say that the plaintiff's expert, Dr. Smith, I think it was one of the very last questions asked at the entire trial, was asked whether Optium could have offered the non-infringing QAM transmitter all along. And he said yes. And I asked him, in fact, you testified that they could have done so from the start of the damages period. Isn't that right? And he said, yes, I may have testified to that. So even the plaintiff's expert agrees that the non-infringing alternative QAM transmitter, which the evidence plainly showed was acceptable to the customers that our witnesses testified was available all along, the plaintiff's expert agreed the defendant could have done that from the start. And you don't think that the jury was free to use the substantial evidence or that it would be substantial evidence, just the fact that you didn't actually do it for 17 months? I don't think so, Your Honor. No, I don't think that that meets the standard under the grain processing case. The testimony, I think, was they just didn't get around to it. There was no willfulness allegation with respect to infringement of that patent, so that wasn't an issue. It was just not the highest priority project within the company. But the testimony, the only testimony, the unrebutted testimony was as soon as the engineers turned to the project, they used know-how that they always had had, they used equipment that they always had had. In fact, reverting to the couplers was exactly what the patent had said was in the prior art. The patent purported to be an improvement over the use of the technology. Can I jump you to a different issue now? You certainly can. Do you mind? I don't mind at all, Your Honor. I really want to be… All right. The motion to amend, you wanted to amend your pleadings to include covenant not to sue that you had a license under the patent in light of the Finisar license, is that right? That's correct, Your Honor. So here's my question. Did Optium, did they participate in the settlement with Finisar? I'm distinguishing between what I… Did you represent Finisar? Yes, I did, and I'm distinguishing… Well, no, I didn't represent Finisar. Did you negotiate or were you involved in the settlement of that case? No, I did not negotiate. But in-house counsel, I don't know what's in the record. I'm trying to distinguish between what I know as the lawyer below. Don't reveal anything you shouldn't. I know. No, and it's not a privilege issue. I'm just trying to make sure that we make judgments based on the record. But the court held that the agreement clearly was limited to that earlier. The court held that, and I think that was legal error. I think that constitutes an abuse of discretion because that was legal error. The court also held that raising the motion to amend was dilatory. It was raised two weeks, and in response to that, I would say that the motion for leave to amend was filed two weeks following entering to that agreement. But I think the court implicit in that was suggesting that Optium knew all along because you had to have. I mean, that was their impression, and so… That's right. This is a complicated… Did Optium know about the ongoing negotiation with Finisar and the possibility that this would happen? Yes, that is in the record. But it was an abuse of discretion to find delay. The motion was filed within two weeks of entering into the agreement. The court found that Optium should have notified the court some point earlier during simply the negotiations. But this was, and this is all in the record, this is a complex business transaction. JDS Unifase sold a business unit to Finisar, and there were many moving parts to that transaction. And it was never clear whether that transaction might ever come to fruition. As one part of that transaction, JDS Unifase and Finisar entered into a covenant not to sue. That is the subject of the license and release defense. But it was never clear until the day it was executed that it actually was going to happen. And then within two weeks, Optium sought leave to amend to plea license and release. So it certainly is our view that it was an abuse of discretion to find that there was any delay there. I have a sense, though, that the trial court judge thought that there was bad faith in the entire process. I mean, she, right? Yes, that's correct. She has the impression, it seems to me, that Optium was pulling the wool over JDSU's eyes, in effect, because JDSU wouldn't have agreed to give up this litigation without mentioning it, without including it. I mean, isn't that a little bit of what happened here? I mean, isn't it like, aha, we got you. You agreed now. Finisar and its affiliates, yeah, we're out! You know, without them realizing that's what they had just done. That's fair enough. I can't speak to what JDS Unifase knew, Your Honor. There is a component of the district court's finding that does concern bad faith. That's not the bad faith that the court identifies. The court says Optium mustn't believe this because Optium hasn't dropped its non-infringement and invalidity counterclaims. And the response to that is that, one, there are several responses. One, the underlying covenant not to sue permits Optium to continue to press those defenses as long as it's subject to an infringement claim on those patents. And two, it's not reasonable to expect that Optium would drop those defenses when, as it turns out, since we're here before the court today talking about these issues, there was a question whether Optium's license and release defense were going to come into the district court action. Speaking of reasonability. Pardon me, Your Honor? Speaking of reasonability, the court says the failure to follow the dispute resolution provision, the failure to take steps to terminate other legal action, and not the type of conduct you would expect or anticipate from a party that believes in good faith that the settlement agreement applies to this case. And here again, as you rightly point out, we have an abuse of discretion standard. Right. I'd say about that, Your Honor. I talked about Optium was, Optium didn't have the right to provoke arbitration. Finisar did under that agreement. Optium is facing a jury trial in a matter of weeks. And promptly, no delay, promptly brings to the court's attention this license and release defense in order to fend off the threat of the jury trial. And as I said, Optium was free to plead in the alternative all along. As long as Optium stands accused of patent infringement, the agreement permits it, and alternative pleading permits it to continue to press its invalidity and non-infringement declaratory judgment counterclaims. Optium was not under an obligation to drop those counterclaims and run the risk that the court would not permit the license and release defense to come in. And now it would have no declaratory judgment invalidity or non-infringement counterclaims. So I think that is an abuse of discretion. And with respect to the court's finding and denying the motion for leave on the grounds of futility, that was legal error. First of all, the court went beyond the pleadings to accept the declaration from JDS Uniphase that said it did not intend to release the Pennsylvania litigation. That was beyond the pleadings. And the court finds that the right to grant the license by JDS Uniphase was illusory as another grounds for futility. And that's never the right answer under New York law, which governs this contract. It can't be the right answer that the parties negotiated an agreement that one of the rights that was negotiated for was futile. So that's with respect to the license and release defense. With respect to standing, the court MCOR was given the right to sue. MCOR was given the contractual right to sue. But there's certainly a wealth of case law that says the contractual right to sue does not comprise that. Yeah, but the wealth of the case law usually involves cases where the question is whether the exclusive licensee had all substantial rights and could sue without the patentee. The patentee was joined here. That's correct, Your Honor. But our position is that MCOR lacked the sufficient rights to exclude that are necessary to confer constitutional standing. It lacked a genuine proof. But it was an exclusive licensee within a field of use. It was given the right to sue. The patentee joined. So I don't see how you get into all these substantial rights and whether there were other rights that weren't granted. Because it was not genuinely an exclusive licensee in that field, Your Honor. JDS Uniphase retained the right to grant to other parties, including Optium, license rights, including in the field that MCOR had rights in. But not the right to sue. The purpose of that provision, the purpose of that evolution of the law, is that an accused entity won't be subject to suit by more than one party. There's no allegation that there were other outstanding entities that had the right to sue on these patents. That's right. There is no that's correct. We don't contend that there was somebody else that had the right to sue. But the fact of the matter is, despite what the agreement might have said, it doesn't even characterize all the licenses as exclusive. With respect to the 374 patent asserted against the QAM transmitter, it's not even called an exclusive license. But even with respect to the license under what the breach called the Logan patents, it says that it's exclusive. But the fact of the matter is, JDS Uniphase retained the right to grant additional license. You've got to get around our YF decision. No matter whether I agreed with you or not prior to YF, I'm bound by YF now. And it's so on point. I understand. Tell me how it's not. Because in YF, the licensors there, I think I'm into my rebuttal time, the licensors there did not retain the right to grant licenses to the defendants in that case. The YF defendants could not go to the licensors who retained license rights and get a license. Here, Optium could go to JDS Uniphase and get a license. That's the difference. If you were suing them on technology of your patent rights, then they could grant you a license in order to settle that suit. But there's no evidence of any ongoing litigation between you all and JDSU such that it would entitle you to claim that you could exercise that and have even the possibility of a license, just like in YF.  the motion for leave to amend. Because that litigation between JDS Uniphase and Finisar, the court never resolved on the merits of the question whether that was qualifying litigation. And it was always within Optium's sole control to file a lawsuit, if it chose, to provoke qualifying. But just like under YF, you know what? You could have become business affiliates. You could have become a subsidiary. I mean, hypothetical could haves weren't enough in YF. I don't see how they could possibly be enough here. That was dependent on decisions made by the licensors in those cases. Here, Optium could provoke qualifying litigation. Yes, but that doesn't get you a license. It's still a decision by the licensor, because JDSU would have to decide it's in their interest to give you a license in order to settle with you. Pardon me. The JDS Uniphase may choose not to grant the license. Doesn't change the fact that they were free to grant the license. And that undercuts AMCOR's exclusive rights. We've exhausted your time with questions. We'll save your rebuttal, Mr. Kahn. Thank you very much. Mr. Castaneous. Thank you, Judge Newman, and may it please the court. I'm going to take the issues that my friend, Mr. Klein, has raised in the order that he raised them. First, he raised an issue with regard to lost profits to JDSU on infringing modulators. What he didn't point out to the court is that there's a contract that was in the record and before the jury at page A2267. There is a contract between JDSU and AMCOR that says that anticipates that JDSU will provide 400 Schedule C modulator units prior to the end of each two consecutive fiscal quarters. There's some dispute as to whether that's 400 every quarter or 400 every two quarters. But the point is this. 400, even if it's every two quarters, would be more than enough capacity to make every one of the 500 some transmitters. What about the other lost profits issue? On the other lost profits issue, Judge Moore, excuse me, the answer here is, first of all, grain processing in cases following it puts that burden on Optium, not us. The burden of showing that there was an available non-infringing alternative. They introduced the testimony of the technical individual, Mr. Fiorillo, that explained it was simple to make. It took him a matter of minutes. It took six weeks to get it in full production. It cost $12,000. They did. And our expert testified, and this is at page A1431. Now, wait. This is your damages expert, Mr. Gleason. Mr. Gleason has no technical background at all, correct? I mean, he is an expert. No, he is your damages expert. He's the damages expert. Yes, that's correct. He is not a patent expert. He was not qualified as such. He has no technical background that would allow him to offer any testimony at all on technology. Isn't that right? Well, I don't know that I would say that, because look at what his testimony is, Judge Moore. Well, no. Before we look at his testimony, I want to be clear. He doesn't have a technical background. That's correct. He is an economic guy. He wrote an opinion called Sundance. And Sundance says, if you don't have a technical background, you don't get to offer technical type of testimony that needs to come from one of skill in the art, like infringement testimony, obviousness testimony, that sort of thing. Sure, but this isn't that type of testimony. This is about whether there is an available and whether, in fact, it's a credible claim of an available non-infringing alternative. And what's the testimony that the jury hears here? Should he be allowed to offer testimony that, no, it wasn't a simple fix? It's a very complicated fix, taking resistors and switching a couple resistors. But that's not what he says. He simply says that, look. But I'm asking you, should he be allowed that? Well, should he be allowed to? I don't know. This is not an evidentiary ruling. This is a question of whether there was sufficient evidence to sustain the jury's award here. But again, with regard to this evidence, the question is whether that evidence, the jury was at liberty to disbelieve. And we say yes. And we say that Mr. Gleason offered. But not based on nothing. You agree with me not based on nothing, right? If the only evidence of record, say there was no evidence, you introduced no evidence whatsoever, and their only evidence of record was it was incredibly simple to do, you did it in no time flat, and you didn't even cross-examine their expert, would the jury be free to disregard that evidence and reach a contrary conclusion in light of no cross-examination and no contrary evidence? I think the jury could, because the jury could simply say that I don't believe that witness. I don't believe that witness. And in trial litigation, again, I'm not going to. And there would always be substantial evidence if that's the case, right? And because even in the complete and utter absence of evidence, you could say it's substantial because the jury could disregard their proof, and they had the burden of proof. But you say to me, for example, you say, Judge Moore, you didn't cross-examine their witness. Well, we're entitled to do that or not. But we did put on our expert. And he was asked, what do you think about that assertion about availability? And his answer is, that didn't make a lot of sense to me. I have my appendix here. So please tell me exactly where you are. I'm at page A1431. Yes. Which page they're on? On page 200. 200. And I'm at line 6. Line 6. And what does Optium say about the second generation QAM? Answer. Well, Optium's expert takes the position that the QAM could have been designed around in a matter of six weeks and $12,000. You, six weeks and $12,000 is what the position taken is by Optium's expert for the design around. So question. What do you think about that assertion? Answer. That didn't may, and I think he meant to say make, a lot of sense to me. Because if the QAM could be designed around for as little as six weeks and $12,000, I don't understand why it took them 17 months to, after being noticed of infringement, to get to the market. And I would point out, Judge Moore, that in the microchemical case. No. Before you go to any cases, what would you like me to take away from that sentence? This is a damages expert with no technical background at all. And he is only saying that it took 17 months. I would say, Judge Moore, that that expert sowed sufficient doubt in the mind of the jury. For the jury to say, you know what? That didn't ring true to me, that evidence that he gave about the technical ability to design around. That didn't ring true, because if it had only cost them $12,000 to do it, why are they not designing around until 17 months after? Remember, the damages period, they'd done it by the time of trial. But they didn't do it by the time of the end of the damages period. That's the important point. Why didn't they do it? Why didn't they do it, for heaven's sake? Let's move to the other points. Time is short. Sure. But I started by mentioning the microchemical case. That was a case where it only took four months to get a much more very complicated mechanical device out to market. And the court in that case held that that was not available during the damages period either. Here, we're talking 17 months or eight months. Whatever the 17-month damages period, eight months from the time that he had the aha moment that he could make this change to the time when the change was actually made. I think this jury was allowed to discredit that testimony based on our expert's testimony. Let me turn to the motion to amend, Judge Newman. The motion to amend, I think the court appreciates that this is a discretionary call on the part of the trial judge. But the really important point here is that the motion would have been futile because JDSU couldn't give the license, the covenant not to sue, that they claim was given in this. And that's for simple reason of the intellectual property agreement. Because remember, the intellectual property agreement only allowed- This is not the basis that the court held it was futile. The court held futility, didn't she, on the basis that the covenant is plain on its face and that it doesn't include opium? If you look at the bottom of 278 in footnote 2 of the judge's ruling, she does point out that this was not an infringement misappropriation of violation of intellectual property rights case. So she's clearly picking up that this was not a ground for granting a license under the intellectual property agreement. I'm sorry. I'm on page 278, footnote 2. She just characterizes the Finisar litigation as not an infringement misappropriation or violation of intellectual property rights case. What am I supposed to take away from that? I think what you take away from that is that she is ruling on this motion at the same time she's ruling on their motion to add their affirmative defense, remember, on standing. And she's looking at both the IPA, the intellectual property agreement, as well as this agreement between Finisar and JDSU and saying the IPA says that JDSU can only grant a license in the case of what's called qualifying litigation under that license agreement. And this wasn't qualifying litigation. So JDSU didn't have anything to give to Finisar or to opium under that agreement. Wouldn't that be a dispute between JDSU and its exclusive licensee as opposed to an interpretation of this contract? Well, but remember that we're the exclusive licensee. So that's what the court was looking at and saying, there's no point in this because the only rights JDSU has to give, the only possibility that JDSU has to give rights is when required to settle intellectual property litigation. And that state court case was not intellectual property litigation. And so the court, I think, is picking up on that in both of those orders. I hope I'm making myself clear in that regard. Why did you have a right to sue in a case even though the patentee wasn't there, even though the patentee was joined, when you didn't have a totally exclusive license? Well, we did have a totally exclusive license because no one has been granted another license. The only reserve right on the part of opium, excuse me, on JDSU. Potentially, a license that was potentially not totally exclusive. And I think the answer comes from the colloquy that Judge Moore had with my friend over here earlier in the argument, which is that that's a could've and might have. It's in the same fashion as the Qualcomm might have purchased one of these affiliates and licensed it to sell downstream in the YAV case. That's what we have right now is a case of constitutional standing and injury in fact. We have an exclusive license. And in fact, as our 28J letter pointed out, JDSU could not grant that without violating their cooperation clause in that agreement with us. Well, I think I have answered all of the points that my colleague here on the other side has raised unless the court has further questions for me. Any more questions? Any more questions? I'll give the rest of the time back to the court. Thank you. Thank you, Mr. Castanets. All right, Mr. Kline, two minutes. If I could, Your Honor, just to make it a true rebuttal. The only point I would make is the agreement that counsel referred to for the provision, the agreement between which MCOR and JDS Unifase, JDS Unifase was going to provide modulators to MCOR and relying on that as evidence that JDS Unifase could produce modulators. That agreement includes a section, I think it's 3.6, called capacity shortage or capacity shortfall. That agreement specifically contemplates that JDS Unifase may not be able to produce modulators and provides how it will allocate the modulators it can produce if it has a shortage. So that's the only point I would make in rebuttal. Thank you very much, Your Honor. Thank you. Thank you both. The case is taken under submission.